642 A.2d 648

**Irwin A. POPOWSKY, Consumer Advocate, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 11, 1994.

Decided May 26, 1994.

Craig R. Burgraff, Sr. Asst. Consumer Advocate, for petitioner.

Devin J. Moody, Asst. Counsel, for respondent.

David B. MacGregor for intervenor, Pennsylvania Power & Light Co.

Before McGINLEY and PELLEGRINI, JJ., and RODGERS, Senior Judge.

PELLEGRINI, Judge.

Irwin A. Popowsky and the Office of Consumer Advocate (OCA) petitions for review the decision of the Pennsylvania Public Utility Commission (PUC) allowing Pennsylvania Power & Light Company (PP & L) to record as a regulatory asset the present costs of complying with a change in accounting standards and to recover those costs in future rates.

In December, 1990, the Financial Accounting Standards Board, the body which sets accounting standards for businesses in the United States, issued Statement of Financial Accounting Standards (SFAS) 106. SFAS 106 changed the generally accepted accounting principles to be used by large companies, including utilities, in accounting for post-retirement benefits other than pensions (termed "other post-employment benefits" or OPEB), effective December 15, 1992. SFAS 106 requires companies to move from the pay-as-you-go or cash basis for OPEBs to an accrual method of accounting based on the belief that OPEBs are a form of deferred compensation and the present cost should represent costs of obligations presently incurred. The change from the pay-as-you-go method to the accrual method creates transitional obligations, that is, the accumulated liability for OPEB expenses for both present employees and current retirees during the period up to the date of conversion to an accrual method which had been deferred for future periods under the pay-as-you-go basis.

In 1992, a number of utilities requested the PUC to provide for deferred rate recognition of the costs incurred to comply with SFAS 106. In response, the PUC outlined the approach it preferred companies to take in handling the effects of SFAS 106.[1] The PUC stated that because there is a wide disparity in OPEB coverage between employers and in the costs related to SFAS 106, that the appropriate amount of OPEBs would be decided on a case-by-case basis. It also stated that for ratemaking, the pay-as-you-go basis should continue unless modified, on a case-by-case basis, after the utility has established a dedicated reserve account for funding in excess of actual costs. The PUC ordered that transitional obligation costs associated with SFAS 106 are not retroactive ratemaking and would be handled on a case-by-case basis considering the justness and reasonableness of the costs.

Based on that decision, PP & L filed a petition for declaratory order requesting to defer for accounting purposes and

1. *Pennsylvania Public Utility Commission v. Philadelphia Electric Co., et al.,* P–920588 (P.U.C. November 4, 1992).

recover in future rates, after its next rate base case, the current incremental costs, that is, the amount between the pay-as-you-go costs which are being recovered in current rates and the accrual costs which are not yet being recovered but must be recognized for accounting purposes pursuant to SFAS 106.[2] The OCA filed an answer contending that the pay-as-you-go method should continue for ratemaking purposes and PP & L should file a ratemaking petition if it feels its rates do not meet its costs. Lehigh Valley Power Committee (Lehigh Valley), an association of four of PP & L's largest industrial customers, filed a petition to intervene objecting to deferred recovery of costs because recovery must take into consideration the effect of the incremental costs on current finances.

The PUC held that a utility that has satisfied the customer notice requirements and presented sufficient documentation to support its SFAS 106 cost estimates may seek formal approval to record on its books an asset equal to the difference between its current rate recognition of OPEB costs and its accrued liability for such expenses under SFAS 106 (or the incremental costs), subject to recovery in future rate proceedings to the extent such costs are prudently incurred. The PUC granted PP & L specific permission to record as a regulatory asset the incremental costs incurred between the date of the adoption of SFAS 106 and the date of the new rates reflecting the costs of compliance with SFAS 106. These costs would include amortization of the transitional obligation costs.[3] The PUC also stated in paragraph 3 of its order:

> The regulatory asset recorded pursuant to this Opinion and Order is allowable for ratemaking purposes in Pennsylvania subject to prior review in a base rate proceeding. In PP & L's base rate filing referred to above, the Company will be

2. For the year 1993, PP & L estimated a cash expense of approximately $8 million under the pay-as-you-go method and, based on an actuarial study, the accruals for OPEBs would be approximately $25 million, including amortization of the transition obligation costs. Based on these estimates for 1993, the incremental costs would be approximately $17 million.

3. The PUC required PP & L to fund an escrow account as a dedicated reserve fund for OPEBs.

allowed to make a claim to recover in rates: 1) the level of annual costs, including amortization of the transition obligation, required to be accrued under FASB [SFAS] 106 (to the extent that the level of benefit costs claimed were prudently incurred), and 2) the amortization over the period between the effective date of base rates and twenty years from the date of adoption of FASB 106, of the regulatory asset recorded pursuant to this Opinion and Order.

OCA then filed this appeal.[4]

What makes this case unique is that the rule against retroactive ratemaking is usually invoked in rate cases, but here, no rate case was filed and the declaratory order procedure was used. Because it was not raised on appeal, we need not address whether the PUC has the authority to directly affect future rates by approving an item of expense outside of a rate case. The PUC order means that costs incurred now will be rolled into PP & L's next rate case and will be paid by future ratepayers.

OCA and Lehigh Valley contend that the PUC erred in assuring PP & L that it could recover in future rates the deferred incremental costs without regard to whether PP & L's rates are adequate to cover such expenses. The OCA and Lehigh Valley argue the PUC's prior line-item approval for these incremental costs in PP & L's next rate case and the allowance of these costs in a future rate case would violate the rule against retroactive ratemaking. Simply put, the OCA and Lehigh Valley contend that the ruled against retroactive ratemaking prohibits the PUC from authorizing PP & L to recover the incurred costs from 1993 onward until PP & L decides to file its next rate case from future ratepayers under its next rate case.

4. The scope of our review of a decision of the PUC is to determine whether constitutional rights have been violated or an error of law committed and whether the findings are supported by substantial evidence. *Columbia Gas of Pennsylvania, Inc., v. Pennsylvania Public Utility Commission,* 149 Pa.Commonwealth Ct. 247, 613 A.2d 74 (1992), *affirmed,* 535 Pa. 517, 636 A.2d 627 (1994).

To the contrary, the PUC and PP & L contend that the rule against retroactive ratemaking does not apply to OPEB costs because they would have been recovered at a later date anyway under the pay-as-you-go method. Even if the rule against retroactive ratemaking applies, they argue, the exception for extraordinary, unanticipated expenses applies because these costs were caused by an unanticipated change in accounting standards and are non-recurring.

To determine whether the recovery of incremental costs in future rates would be prohibited by the rule against retroactive ratemaking, it is useful to compare exactly what would be included in rates after the next rate case under the PUC order. In the year 1993, PP & L estimated the cost of OPEBs under the pay-as-you-go method as $8 million, this amount was included in the prior rate case as projected by PP & L. The cost of OPEBs under the accrual method was estimated by PP & L to be $25 million, which included the amortization of the transitional obligation costs or the costs previously incurred but not yet accounted for under the pay-as-you-go accounting method. If PP & L had filed a rate case rather than a request for a declaratory order, the entire $25 million for 1993 would have been an expense and recovered at that time. However, under the PUC's order, the incremental costs, that is, in 1993 the $17 million difference between the $25 million incurred for OPEBs and the $8 million recovered under prior rates, is deferred until PP & L's next rate case. At that time, the ratepayers will be paying both the costs of OPEBs and a share of the amortized transitional obligation and also a share of the incremental costs deferred in 1993 and beyond until that rate case. If, as expected, PP & L files its next rate case in 1995,[5] future ratepayers would pay approximately $34 million for incremental costs in 1993 and 1994.

Ratemaking, by its nature, is prospective. *Columbia Gas.* Typically, a utility files a general rate case with a record of revenues and expenses for the past year and a projection of anticipated expenses and revenues for a future test year. *See*

---

**5.** PP & L had a "corporate objective" to delay filing a rate case until at least the 1994–95 time frame. (Reproduced Record 17a).

Section 315(e) of the Public Utility Code (Code), 66 Pa.C.S. § 315(e). The future test year is a projection of a future 12–month period reflecting anticipated or projected results of operations. 52 Pa.Code § 53.56; *Columbia Gas,* 149 Pa.Commonwealth Ct. at 252, 613 A.2d at 76. The use of a test year allows the prudently managed utility to recover all expenses and a reasonable return and, therefore, requires normalization or removal of all abnormal, non-recurring events from the test year. *Id.;* Cawley & Kennard, Rate Case Handbook, 1983, pp. 54, 150–51. Based on the information provided, the PUC determines whether the utility has proved that its requested rates are just and reasonable. Section 315(a) of the Code, 66 Pa.C.S. § 315(a). In this case, no rate case had been filed and the purpose of PP & L's filing of a request for declaratory order was to postpone filing a general rate case while getting a determination of how the accrual costs of OPEBs would be handled in a general rate case.

■ Because of the prospective nature of rates, a rule against retroactive ratemaking has developed. The rule against retroactive ratemaking prohibits a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits. Krieger, The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings, 1991 Univ.Ill.L.Rev. 983, 984. The policy reasons behind this rule are that if retroactive ratemaking is allowed, it makes the "test year" method of ratemaking meaningless and the general principle that those customers who use power should pay for its production rather than requiring future ratepayers to pay for past use. This court has stated the rule as "[t]he Commission clearly may not establish rates which are calculated to retroactively recover surpluses or refund deficits created by inaccuracies in its prior rate authorizations." *Pike County Light & Power Company v. Pennsylvania Public Utility Commission,* 87 Pa.Commonwealth Ct. 451, 456, 487 A.2d 118 (1985).

We applied this principle that expenses incurred in past years would not be reimbursed in *Philadelphia Electric Com-*

*pany v. Pennsylvania Public Utility Commission,* 93 Pa.Commonwealth Ct. 410, 502 A.2d 722 (1985) (*PECO* ). In that case, the utility requested recovery in rates for maintenance and depreciation expenses of pollution control facilities which were required, in part, by the Environmental Protection Agency. Although the PUC had previously allowed PECO to use a deferred accounting method, it refused to allow the recovery of those expenses because it was retroactive and the expenses were neither extraordinary nor non-recurring. This court agreed and stated: "these pollution control facilities' expenses were not, for whatever reason, anticipated by the utility nor made the subject of evidence before the Commission in this previous rate case, and the question presented by PECO's claim for deferred expenses in the instant proceeding is whether a utility may properly found a claim for increased *prospective* rates on past expense items which were greater than anticipated by the utility's proofs supporting the customer charges in effect." *Id.* at 420, 502 A.2d at 727 (emphasis in original). We held that the excess over the projection of an isolated item of expense could not, without more, be the subject of a recovery in the utility's subsequent rate increase request. *Id.* at 422, 502 A.2d at 728.

■ OCA argues that the PUC's assurance of future rate recovery violates the rule against retroactive ratemaking and does not fit within the exception for extraordinary expenses. For the purposes of this appeal, OCA does not challenge the propriety of allowing PP & L to utilize the accrual method for OPEBs for ratemaking purposes nor whether the allowance of the transitional costs violates the rule against retroactive ratemaking.

The PUC and PP & L argue that recovery of these costs are not retroactive at all because under the pay-as-you-go method, these costs would have eventually been recovered at the time they were paid out. Changing the accounting method to accrual, they argue, affects only the timing of the recovery. In this argument, they rely on the analysis in the Federal Energy Regulatory Commission's Statement of Policy on Post–Employment Benefits Other Than Pensions, 61

F.E.R.C. ¶ 61,330, 138 P.U.R.4th 353 (1992). *See also New England Power Company,* 65 F.E.R.C. ¶ 61,036 (October 6, 1993). However, PP & L's argument focuses on the recovery of transitional obligation costs not at issue in this case. In this case, the additional incremental costs would be added to the burden of the future ratepayers even though the accounting method was changed in 1993. That additional element makes the analysis of FERC policy inapplicable. Because the incremental costs recovered in some future rate case would relate to 1993 and the years up until the next rate case, what PP & L requested and the PUC awarded is retroactive ratemaking.

Although the rule against retroactive ratemaking applies to the recovery of costs relating to prior periods, PP & L argues that these costs would be allowed under the exception to the rule for extraordinary expenses. We have held that the PUC may, in a rate case, take into account extraordinary losses or gains occurring in the past, usually by amortizing for the loss of items that are part of the rate base. *Pike.* Although our cases have not clearly defined the extraordinary exception by example, we know a weather-related expense caused by what is commonly referred to as an "act of God" is considered extraordinary. *Commonwealth of Pennsylvania v. Pennsylvania Public Utility Commission,* 17 Pa.Commonwealth Ct. 351, 331 A.2d 598 (1975) (flood damages); *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company,* 57 Pa.P.U.C. 204 (1983) (cold weather maintenance expenses for thawing and repairing frozen mains); *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company,* 52 Pa.P.U.C. 77, 24 P.U.R.4th 525 (1978) (flood damages).

Extraordinary expenses are often described as unanticipated and non-recurring. We believe that any unanticipated, non-recurring, substantial expense to the rate base that would be normalized out if occurring in a test year is "extraordinary". Extraordinary cannot mean merely unanticipated, because then every unexpected occurrence or failure to predict an item would be recoverable and the exception would

overwhelm the rule, making test years meaningless. To be extraordinary, it must also be a substantial, one-time expense or a substantial item that will not appear as a continuing expense and could otherwise never be recovered in rates because, like the weather-related expenses, it would be normalized out of the test year as abnormal.

These principles, though not explicitly, were applied in *PECO*. The costs of the pollution control devices in *PECO* were not extraordinary because those costs would be recurring as part of the cost of maintaining the existing facility. Also, the utility could have recovered the costs in rates had it filed its rate case earlier.[6] Similarly, in this case, the incremental costs in 1993 are recurring; PP & L will be continually incurring those costs because it was required to change to the accrual method. Also, PP & L could have recovered those costs had it filed a rate case rather than a request for declaratory order.

Moreover, in light of the underlying policies of the rule against retroactive ratemaking, we believe that requiring future ratepayers to pay not only the transitional obligation costs of changing to the accrual method but also the incremental costs incurred in 1993 and beyond until the next rate case unfairly burdens the future ratepayers.

Because the incremental costs were, in fact, anticipated before the request for declaratory order was filed[7] and because the costs are recurring and could otherwise be recoverable in rates, the exception for "extraordinary" expenses does

6. The facts in *PECO* state that the devices were required under a consent decree in litigation commenced by the Environmental Protection Agency, and therefore, the costs were anticipated from the time of the consent decree until actually incurred.

7. SFAS 106 was released in December 1990 and not made effective until January 1993. This change had been under consideration for a long time. On November 22, 1982, the Financial Accounting Standards Board released a statement of preliminary views proposing that the accrual method be imposed for accounting of OPEBs, and on September 27, 1989, a proposed draft of the standards requiring the accrual method was released. *See* BNA, Inc., Securities Regulation and Law Report, vol. 14, no. 46, p. 2051, November 26, 1982; BNA Pension & Benefits Reporter, vol. 16, no. 41, p. 1765, October 9, 1989.

not apply. Therefore, the incremental costs would be prohibited by the rule against retroactive ratemaking and the PUC's order improperly assures future recovery. Accordingly, the order of the Pennsylvania Public Utility Commission is reversed.

## ORDER

AND NOW, this 26th day of May, 1994, the order of the Pennsylvania Public Utility Commission dated May 6, 1993, Docket No. P–00920635, is reversed.